# CITY OF ST. LOUIS v. SAM BASKOWITZ, Appellant.

### Division One, March 4, 1918.

1. **JUNK DEALER: Power of City to Regulate: Ejusdem Generis.** A city has no inherent power to license or regulate any occupation, unless perhaps it be such as is *malum in se* or closely allied thereto; but a city charter, which enumerates a large number of occupations which the city may license and regulate and then includes "all other businesses, trades, avocations or professions whatsoever" and further says that the city may "license, tax, regulate or suppress all occupations, professions and trades not hereinbefore enumerated, of whatever name and character," gives the city power by ordinance to license and regulate junk merchants and junk dealers, although they are not among the occupations specifically mentioned, for the quoted words cannot be held to

include other occupations of a kindred kind and character to those mentioned, but on their face are without meaning unless they are made to apply to occupations not enumerated, and clearly manifest a legislative intention to include others not specifically mentioned.

2. **EQUALITY OF TAXATION: Different Tax on Merchants and Junk Merchants.** The city, under its charter authorizing it to license and regulate merchants and all other occupations not enumerated, may classify merchants as one occupation, and junk merchants or junk dealers as another, and place one license tax on the one class and a different license tax on the other, and it will not thereby violate the constitutional provision requiring a tax to be uniform upon the same class of subjects.

3. **JUNK: Police Regulation: Power of City.** The business of dealing in junk and second-hand goods is of such character as to warrant police regulation; and charter provisions authorizing the city to enact ordinances "to prevent the introduction and spread of contagious diseases" and "to pass all ordinances as may be expedient in maintaining the peace, good government, health and welfare of the city, its trade, commerce and manufactures, and to enforce the same by fines and penalties" are ample authority for enacting ordinances licensing and regulating "the business of buying, selling or dealing in old junk, metals, bottles, syphons, books or other articles usually found in junk shops," and requiring the junk dealer to keep a book in which shall be recorded in ink "the names of all persons from whom he purchases any article whatever and an accurate description of the article, together with any marks, brands, letters or words of identification thereon," and making it unlawful to buy any such article "from any minor without the written consent of his parent or guardian," and imposing a fine upon him for failure to pay such license or to keep such registry—all in the interest of sanitation, to aid in the prevention of easy thefts, and to preserve the morals of youth.

4. **JUNK DEALER: In Old Bottles Exclusively.** One dealing in old bottles exclusively may be regarded as a junk dealer, and may be so classified, and his business regulated by ordinance under charter provisions authorizing the city to enact police regulations.

5. ———: **Double Taxation.** The assessment upon a junk dealer of a merchant's license tax and of a separate junk dealer's license tax, in pursuance to charter and ordinance provisions, is not double taxation. If both occupations are pursued by the same person it is competent to impose a license tax on each occupation.

6. ———: **Registry of Purchases: Inspection by Any Citizen: Unreasonable Search and Seizure.** An ordinance requiring a junk dealer to "keep a book of registry, in which shall be recorded in ink or indelible pencil the names and addresses of all parties from whom he purchases any article whatsoever, together with the date of

such purchases and a full and accurate description of the article, together with any marks, brands, letters or words of identification thereon," and requiring that "said book of registry shall at all times be kept open for the inspection and examination of the police or any citizen," does not authorize unreasonable searches and seizures for private purposes, and is not violative of the constitutional provisions concerning unreasonable search and seizure. The "any citizen" referred to is any one whose property has been stolen and who demands an inspection of the book for the purpose of assisting him in the discovery of the property and the apprehension of the thief, and not a disinterested curious person.

7. ————: ————: **Large Business: Unreasonably Oppressive.** The fact that the junk dealer conducts a very large business and to keep a registry of all old bottles purchased by him would be practically impossible, does not render the ordinance requiring such registry to be kept unreasonably oppressive. No one has an inalienable right to conduct a junk shop; to do so is a privilege, which may be absolutely denied, or regulated, under the police power for the protection of the public health and the prevention of easy thefts, and the size of the business can in no wise increase or decrease the authority to regulate it.

Appeal from St. Louis Court of Criminal Correction.—
*Hon. Victor H. Falkenhainer,* Judge.

AFFIRMED.

*Jamison & Thomas* for appellant.

(1) Where the provisions of an ordinance are so interwoven and connected as to be interdependent, each part having a general influence over the rest, and a particular provision thereof is void, the entire ordinance will be so declared. Kirkwood v. Highlands Co., 94 Mo. App. 637; Hannibal v. Tel. Co., 31 Mo. App. 23; State ex rel. v. Clifford, 228 Mo. 208; Chicago v. Gunning System, 114 Ill. App. 377. (2) A city possesses no inherent power to license or to regulate any occupation, or to require the payment of a tax for the privilege of engaging in the same. That power must be expressly granted in its charter or the statute of the State; and, where there is any fair and reasonable doubt concerning the existence of the power of a municipal corporation to

St. Louis v. Baskowitz.

license, or to regulate, or to impose a license tax upon any occupation, it is to be resolved against the corporation. The express enumeration of certain occupations or businesses in the charter of the municipality is by a well known canon of construction an exclusion of all other occupations, although the enumeration of the special occupations may be followed by a general clause regarding all occupations and trades of whatsoever character. R. S. 1909, sec. 9580; Kansas City v. Grush, 151 Mo. 128; Fulton v. Craighead, 164 Mo. App. 90; Independence v. Cleveland, 167 Mo. 384; Joplin v. Leckie, 78 Mo. App. 12; Trenton v. Clayton, 50 Mo. App. 535; St. Louis v. Laughlin, 49 Mo. 559; Knapp v. Kansas City, 48 Mo. App. 485; State v. Butler, 178 Mo. 312; St. Louis v. Kaime, 180 Mo. 309; St. Louis v. Construction Co., 244 Mo. 479; State v. Baskowitz, 250 Mo. 82; Belt Co., v. Milwaukee, 138 N. W. 621; Chicago v. Reinschreiber, 121 Ill. App. 114; In re Unger, 22 Okla. 755; Thomas v. West Jersey Railroad, 101 U. S. 82; Herb Bros. v. Alton, 264 Ill. 628; Harris v. Commonwealth, 81 Va. 240; City of Cairo v. Bross, 101 Ill. 475; 1 Dillon on Municipal Corporations (5 Ed.), 237; 2 Dillon on Municipal Corporations (5 Ed.), 586. (3) Section 1605 of Ordinance No. 24751 is unconstitutional and void because it assesses an occupation tax which is not uniform upon the same class of subjects, and is, therefore, violative of section 3, article 10, of the Constitution of Missouri. Judson on Taxation, par. 459, p. 599; State ex rel. v. Ashbrook, 154 Mo. 375; Kansas City v. Grush, 151 Mo. 128. (4) One dealing exclusively in old bottles cannot be regarded as a junk dealer, and hence subject to an ordinance requiring a license of junk dealers; a fortiori, one dealing exclusively in large quantities of new and old bottles, the largest percentage thereof being in new bottles, cannot be regarded as a dealer in junk. Carbury v. United States, 116 Fed. 773; Chicago v. Reinschreiber, 121 Ill. App. 114; Chicago v. Lowenthal, 242 Ill. 404; City of Chicago v. Lowenthal, 146 Ill. App. 570; Metal Refining Co. v.

Chicago, 140 Ill. App. 599; Lines v. Savannah, 61 S. E. (Ga.) 598. (5) The trial court erred in sustaining the objection of plaintiff's counsel to defendant's exhibit showing that a merchant's state and city license had been issued to the defendant. To have exacted the license fee required by the ordinance in question in this case, together with the merchant's state and city license, would be double taxation. Etterman v. Shelton, 104 Tenn. 70; Newport v. Fitzer, 115 S. W. (Ky.) 742; Kansas City v. Grush, 151 Mo. 128. (6) The appellant's motion to quash should have been sustained and the appellant discharged, because the ordinance is unconstitutional and void; because it deprives the appellant of his property without due process of law and is, therefore, in violation of section 30, article 2, of the Constitution of Missouri; further, because it authorizes unreasonable searches and seizures for private purposes and is, therefore, in violation of section 11, article 2, of said Constitution. Lowry v. Rainwater, 70 Mo. 152; St. Joseph v. Levin, 128 Mo. 588; 1 Bishop on Criminal Procedure (4 Ed.), sec. 240; Robinson v. Richardson, 13 Gray, 454.

*Charles H. Daues* and *H. A. Hamilton* for respondent; *Phillip W. Moss* of counsel.

(1) The city of St. Louis is authorized by its charter to license, tax and regulate dealers in junk and second-hand articles. Charter, art. 3, sec. 26, cl. 5; St. Louis v. Herthel, 88 Mo. 128; St. Louis v. Bowler, 94 Mo. 630; St. Louis v. Weitzel, 130 Mo. 600; Bank v. Ripley, 161 Mo. 132; Ex parte Smith, 231 Mo. 111; Gunning Co. v. St. Louis, 235 Mo. 99; St. Louis v. Herthel, 14 Mo. App. 471; St. Joseph v. Lung, 93 Mo. App. 626. (2) Junk shops and dealers in second-hand articles are subject to license and regulation by the city under its police power. Charter, art. 3, sec. 26, cls. 6, 12, 14; St. Joseph v. Levin, 128 Mo. 588; Gunning Co. v. St. Louis, 235 Mo. 99; Kansas City Co. v. Kansas City, 240 Mo. 659; State v. Baskowitz, 250 Mo. 82; Grand Rapids v. Braudy, 105 Mich. 570; Grossman v. Indianapolis, 173

Ind. 157; Marmet v. State, 45 Oh. St. 63; State v. Phillips, 77 Oh. St. 215; State v. Cohen, 73 N. H. 543; Commonwealth v. Hood, 183 Mass. 196; Commonwealth v. Silverman, 220 Mass. 552; Levi v. Anniston, 46 So. 237. (3) It is competent for the city, as the delegated agent of the State, to collect an *ad valorem* tax on property used in a business, and also impose a license tax on the pursuit of the business. St. Louis v. Green, 70 Mo. 562; St. Louis v. Weitzel, 130 Mo. 600; Aurora v. McGannon, 138 Mo. 38; Monett v. Hall, 128 Mo. App. 91. (4) Where certain provisions of an ordinance attacked are valid and such provisions are severable from others claimed to be invalid, the whole enactment will not be declared void, but the valid portions will be sustained unless that would defeat the general purpose of the law. Quinette v. St. Louis, 76 Mo. 402; Asphalt Co. v. Ullman, 137 Mo. 569; St. Louis v. Liessing, 190 Mo. 489; Gist v. Construction Co., 224 Mo. 388; State ex rel. v. Clifford, 228 Mo. 194; State v. Cohen, 73 N. H. 543. (5) An ordinance passed in the exercise of legal authority will not be declared void on the ground of unreasonableness unless no difference of opinion can exist upon the question, and a clear case must be made to authorize a court to interfere on that ground. St. Louis v. Weber, 44 Mo. 547; Gratiot v. Railroad, 116 Mo. 450; Chillicothe v. Brown, 38 Mo. App. 609; Kansas City v. Sutton, 52 Mo. App. 398.

WOODSON, J.—The defendant was arrested and prosecuted by the city of St. Louis for the violation of section 1605 of Ordinance No. 24751 of said city, providing for the licensing, regulation and control of junk dealers in said city. From a judgment of conviction in the St. Louis Court of Criminal Correction the defendant duly appealed the cause to this court.

The section of the ordinance mentioned insofar as is here material reads:

"Any person or persons engaging in the business of buying, selling or dealing in old junk, metals,

bottles, syphons, books or other articles usually found in junk shops, and having a store, stand or place of business, are hereby declared to be 'Junk Merchants' and they shall pay a license fee of fifty dollars per annum; such license shall be available only to the person or persons in whose name or names it is issued, and shall not be used by any person or persons other than the original licensee or licensees: any holder of such license who permits it to be used by any other person, or any other person who uses such license granted to any other person, shall each be deemed guilty of a violation of this ordinance. Any person carrying on the business of Junk Peddler or Junk Merchant or operating or using a cart or wagon in said business, without license, shall be deemed guilty of a violation of this section. . . .     Every Junk Merchant shall keep a book of registry in which shall be legibly recorded in ink or indelible pencil the names and addresses of all parties from whom he purchases any article whatsoever, together with the date of such purchase and a full and accurate description of the article together with any marks, brands, letters or words of identification thereon, if any such there be.    And any Junk Merchant who shall buy, purchase, or in any manner acquire possession of any article having blown, stamped, etched or otherwise indelibly marked thereon any marks, brands, letters or words shall be deemed to buy, purchase or acquire the same with notice of any pre-existing right or title to such article in the owner or proprietor of such marks, brands, letters or words which may by such owner or proprietor be established.    Said book of registry shall at all times be kept open for the inspection and examination of the police or any citizen. Any Junk Merchant who shall fail to keep such book of registry or who shall fail to record therein the description by this section required shall be deemed guilty of a violation of this ordinance and upon conviction thereof, he shall be fined as hereinafter prescribed, and in addition thereto his license shall be revoked

by the License Collector. It shall not be lawful for any Junk Peddler or Junk Merchant to buy or receive any property from any minor without the written consent of the parent or guardian of such minor. Should any controversy arise respecting the ownership of any property alleged to have been purchased by any person licensed under this section, the burden of proof shall be on such licensee to prove the name and residence of his vendor. The provisions of this section shall apply to second-hand dealers and plumbers who may deal in the articles mentioned herein. Any person who shall neglect, violate or refuse to comply with any or either of the provisions of this section shall be deemed guilty of a misdemeanor, and upon conviction thereof, shall be fined not less than ten or more than one hundred dollars." [Rombauer's Revised Code of St. Louis (1912), p. 1002.]

The information filed in said cause was in conventional form and predicated upon said ordinance.

The appellant filed in said cause a written motion to quash the information, stating as ground therefor that the ordinance of the City of St. Louis, under which the information in this case was filed.

"(1) Is unconstitutional and void.

"(2) Is not authorized by the statute of the State of Missouri and is not authorized by the charter of the city of St. Louis, and is therefore void and of no force and effect.

"(3) And also for the reason that neither the statutes of the State of Missouri nor the charter of the city of St. Louis authorized the Municipal Assembly to require a license or to impose a tax for the conducting of a junk shop in the city of St. Louis, Missouri.

"(4) And because the Municipal Assembly of the city of St. Louis has no authority under the Constitution and statutes of the State of Missouri and the charter of the city of St. Louis to impose a tax upon junk-shop-keepers and

"(5) Because the information in the cause against

appellant fails to state facts sufficient to constitute cause of action against appellant."

Said motion to quash was overruled and when the case came on for trial the appellant was duly arraigned and pleaded "not guilty." At the beginning of the case appellant objected to the introduction of any evidence, and moved that he be discharged for the same reasons as set forth in his. written motion to quash, and for the additional reasons: "(1) That the part of the ordinance requiring a junk merchant to keep a registry book is an unreasonable regulation and is prohibitive of the business described by the ordinance and is in violation of the Constitution of this State and the United States; (2) that the ordinance requires a junk merchant to keep a book of registry, which is not required by the ordinance of a junk peddler, and (3) that the information filed in this case is insufficient for the reason that the defendant, Sam Baskowitz, is designated therein as a junk dealer, whereas the information should charge that said Sam Baskowitz is either a junk peddler or junk merchant, and that as a junk merchant he is keeping an established place of business and is carrying on the business of a junk merchant at that particular place."

This oral motion was also by the court overruled; to which action of the court the appellant duly saved his exceptions.

The evidence showed that appellant had a place of business at 812 North 16th Street in said city; that the building in which he transacted business was a large one, with an office and store room; that appellant conducted both a new and a second-hand bottle business, the former being the larger, constituting sixty to seventy-five per cent of the total business; that the second-hand stock "ran way up in the millions" of bottles, and that the appellant had a merchant's license to do business, but had no license authorizing him to carry on a junk merchant's business, nor did he keep a registry of the bottles purchased, as required by said ordinance.

Appellant offered to prove that it was an impossibility to register all the second-hand bottles purchased by him as required by said ordinance. That evidence was objected to, which was by the court sustained, and appellant duly excepted to the ruling of the court.

The court gave a number of instructions which in effect told the jury that if they found the facts to be as before stated, then they would find the appellant guilty, etc; and upon the other hand, that if they failed to so find the facts, then they would find him not guilty.

In addition to the instructions given by the court the appellant asked the court to give to the jury the five following instructions:

"1. The court instructs the jury that if they believe from the evidence in this cause that the defendant was at the time mentioned in the information, to-wit, on the sixth day of April, 1911, engaged in the bottle business in the city of St. Louis, Missouri, and as such dealt in both new and second-hand bottles; and if the jury further find from the evidence that it was impracticable for the defendant to keep a book of registry as specified in section 1605 of ordinance No. 24751 of Revised Ordinances of the city of St. Louis, then the jury will find a verdict of 'not guilty,' and in favor of the defendant in this cause.

"2. The court instructs the jury that if they believe from the evidence in this cause that the defendant was at the time mentioned in the information, to-wit, on the sixth day of April, 1911, engaged in the bottle business in the city of St. Louis, Missouri, and as such dealt in both new and second-hand bottles; and if the jury further find from the evidence that the keeping of a book of registry as set forth in section 1605 of Ordinance No. 24751 of Revised Ordinances of the city of St. Louis, would be prohibitive of said business and prevent the defendant from realizing any profits from his said business, then the jury will find a verdict of 'not guilty' and in favor of the defendant in this cause.

"3. The court instructs the jury that if they believe from the evidence in this case that the defendant was on the sixth day of April, 1911, engaged in the bottle business in the city of St. Louis, Missouri, and as such had the license of the city of St. Louis to transact a bottle business as a merchant, and that the said defendant was not at said time a junk dealer, then the jury will find a verdict of 'not guilty' and in favor of the defendant in this cause.

"4. The court instructs the jury that if they find from the evidence that defendant was on the sixth day of April, 1911, engaged in the business of buying and selling bottles and maintained a store or regular place of business for that purpose, and that defendant's said business consisted of buying and selling bottles exclusively, and that a considerable portion of the bottles bought and sold by the defendant, if you find they were so bought and sold by the defendant, were new bottles, then you are instructed that the defendant is not a junk dealer within the meaning of section 1605 of Ordinance No. 24751 of Revised Ordinances of the city of St. Louis, and that your verdict should be 'not guilty' and in favor of the defendant.

"5. The court instructs the jury that if they believe from the evidence in this cause that the defendant was at the time mentioned in the information, to-wit, on the sixth day of April, 1911, engaged in the bottle business in the city of St. Louis, Missouri, and as such dealt in both new and second-hand bottles; and if the jury further find from the evidence that it was impossible for defendant to keep a book of registry as specified in section 1605 of Ordinance No. 24751 of Revised Ordinances of the City of St. Louis, then the jury will find a verdict of 'not guilty' and in favor of the defendant in this cause."

Which instructions offered by defendant were refused by the court, to which action of the court the defendant at the time duly excepted.

I. It is first insisted by counsel for appellant that "the city of St. Louis has no inherent power to license or to regulate any occupation, or to require the payment of a tax for the privilege of engaging in the same," and that such power, if it exists in the city must be found in the charter thereof, or in the statutes of the State. Then follow a negation of such power, and a citation of the following authorities in support of their insistence: Revised Statutes 1909, sec. 9580; Kansas City v. Grush, 151 Mo. 128; City of Fulton v. Craighead, 164 Mo. App. 90; City of Independence v. Cleveland, 167 Mo. 384; City of Joplin v. Leckie, 78 Mo. App. l. c. 12-13; Town of Trenton v. Clayton, 50 Mo. App. 535; City of St. Louis v. Laughlin, 49 Mo. 559; Knapp v. Kansas City, 48 Mo. App. 485; State v. Butler, 178 Mo. l. c. 312-314; City of St. Louis v. Kaime, 180 Mo. 309; City of St. Louis v. Atlantic Quarry Construction Co., 244 Mo. 479; State v. Baskowitz, 250 Mo. 82; Chain Belt Co. v. Milwaukee, 138 N. W. 621; City of Chicago v. Reinschreiber, 121 Ill App. 114; In re Unger, 22 Okla. 755; Thomas v. Railroad, 101 U. S. 71, l. c. 82; Herb Bros. v. City of Alton, 264 Ill. 628; Harris v. Commonwealth, 81 Va. 240; City of Cairo v. Bross, 101 Ill. 475; 1 Dillon on Municipal Corporations (5 Ed.), par. 237; 2 Dillon on Municipal Corporations (5 Ed.), par. 586.

It is conceded by counsel for respondent that the city has no inherent power to impose a license tax upon ordinary occupations unless such power is granted by its charter or by the statutes of the State. Not only that, but independent of that concession, the authorities cited fully sustain the insistence of counsel for appellant, possibly with the exception of occupations which are *malum in se*, or so closely allied thereto, as to endanger the public health, morals or safety. However, counsel for respondent contend that the city has ample authority to impose such tax upon junk dealers and dealers in second-hand goods, and that said authority is conferred by the fifth clause of section 26 of article

*Power to Regulate.*

3 of the charter of the city of St. Louis, which reads as follows:

"Fifth.  To License, tax and regulate lawyers, doctors, doctresses, undertakers, dentists, auctioneers, grocers, merchants, retailers, hotels, boarding houses, tenement houses, office buildings, public buildings, public halls, public grounds, concerts, photographists, artists, agents, porters, runners, drummers, public lecturers, public meetings and shows, real estate agents and brokers, financial agents and brokers, horse and cattle dealers, patent right dealers, inspectors and gaugers, stock yard proprietors, examiners of titles, conveyances, mercantile agents, insurance companies and insurance agents, bankers, banking or other corporations or institutions, telegraph companies or corporations, street railroad cars, livery and sale stables, hackney carriages, private carriages, barouches, buggies, wagons, omnibuses, carts, drays and other vehicles, *and all other business, trades, avocations or professions* whatever; to fix the rates for carriage of persons, and of wagonage, drayage, and cartage of property, and regulate the width of the tires of all vehicles for heavy transportation; to license, regulate, tax or suppress ordinaries, hawkers, peddlers, brokers, pawnbrokers, money changers, intelligence offices, public masquerade balls, street exhibitions, dance houses, fortune tellers, pistol galleries, lottery ticket dealers, corn doctors, lock, private and venereal hospitals, museums and menageries, equestrian performances, horoscopic views, lung testers, muscle developers, magnifying glasses, billiard tables or any other tables or instruments used for amusement, circuses, operatic, theatrical and other exhibitions, shows and amusements; saloons, beer houses, tippling houses, dramshops, and gift enterprises; and to suppress prize fights, coon fighting, dog fights, chicken cock fights, gaming or gambling houses; and to suppress bawdy and disorderly houses, and houses of ill-fame and of assignation; to provide for and enforce the registration of all births, marriages or deaths; to license, tax, regulate or suppress *all*

*occupations, professions and trades not hereinbefore
enumerated, of whatever name and character."* (The
italics are ours.)

It is the position of counsel for appellant that
since this charter provision has in express terms granted
to the city of St. Louis the power to license and tax
certain enumerated occupations and business, its power
is thereby limited and it cannot tax any other occupa-
tion or business, and that the use of the general
language found in the charter, which we have italicized,
following the particular powers enumerated, does not
extend its power to license any other occupation.

That is a general canon of statutory construction
as shown by the authorities cited, but it has its well
known exceptions, the same as most other general rules,
and one of them is that where the language of the
statute upon its face clearly shows a contrary in-
tention, in such a case the intention of the lawmaker
must prevail over the bare legal inference which is to
be drawn from the enumeration of the specific powers
granted. In other words, the maxim *Expressio unius
exclusio alterius est* has no application where the
statute upon its face clearly conveys a contrary in-
tention of the Legislature.

Returning for a moment to the authorities cited,
and an examination of the statutes and charter provi-
sions considered in those cases, it will be seen that the
general language used therein is much more limited
or restricted than are the general terms of the charter
here under consideration. Here the language of the
charter is very broad, in fact, almost as comprehensive
as the English language can make it; in such case, the
courts, when called upon, must so construe the general
language used so as to express the true meaning of the
lawmaker, and not limit its meaning by the inference
which might be drawn from the enumeration of the
special powers granted in the same section.

The charter provision here under consideration,
after enumerating many occupations and businesses to
be licensed and taxed, contains in the middle thereof

this language: "And all other business, trades, avocations or professions whatever." Then proceeding, it provides that the city shall have the power to license, regulate or suppress numerous other occupations and businesses, and winds up with this language "to license, tax, regulate or suppress all occupations, professions and trades not hereinbefore enumerated of whatever name or character."

If the language just quoted from the charter provision under consideration is to be given any meaning whatever, then it is clear that it was not the intention of the lawmakers to limit the application of that general language to the previous specifically enumerated occupations, for the obvious reason that those words authorize the city "to license, tax regulate or suppress *all occupations, professions and trades not hereinbefore enumerated of whatever name and character,*" thereby clearly indicating a design on the part of framers of the charter to grant to the city other powers than those specifically enumerated.

In other words, the general language in express terms is made *inapplicable* to all occupations specifically mentioned therein, and made applicable to all other occupations, trades and professions not thereinbefore enumerated.

These views are in keeping with numerous rulings of this court in similar cases. In the case of the City of St. Louis v. Herthel, 88 Mo. 128, this court held that the city had the authority to impose a license tax upon architects, although that profession was not expressly enumerated in the charter. On page 130 the court said:

"While we recognize the correctness of this rule and using the language of Judge Bakewell, who delivered the opinion of the Court of Appeals, 'must not enlarge the letter of the charter by giving it an equitable construction as in the case of a remedial statute; but we are to construe it according to the intent of the framers, and that intent must be gathered from the language and object of the charter provisions, and

giving that language an interpretation neither strict nor strained.' The words 'all other business, trades, avocations or professions whatever,' must not be wholly rejected. The maxim *'expressio unius est · exclusio alterius'* is not to be so applied that the city is to be held powerless to tax any calling not expressly named in its charter by its proper name. We think that architects are, for the purpose of construction here, to be held as *ejusdem generis* with lawyers, doctors, dentists and artists, as exercising a profession of technical character, for the useful exercise of which long and careful study, as well as some special experience, is required.''

In construing the fifth clause of the charter of the city of St. Louis as authorizing the imposition of a license tax upon sewing machine agents, this court, in the case of St. Louis v. Bowler, 94 Mo. 630, said, l. c. 632:

''The charter in this case differs very widely from the charter passed upon in city of St. Louis v. Laughlin, 49 Mo. 559; for there, the charter then under consideration was not near so broad in its grant of powers as is the present charter, and it was determined in that case that the profession of law was not *ejusdem generis* with any of the trades and avocations in the then existing charter, to-wit: 'Auctioneers, grocers, merchants, retailers, photographers, artists, agents, porters, runners, drummers,' etc. And that section of the charter concludes with the words: 'And in all other businesses, trades, avocations and professions whatever.' In the present instance it will be observed that the concluding words are: 'All occupations, professions and trades not heretofore enumerated, of whatever name or character.' This language is so very comprehensive that no necessity exists to invoke the rule of *ejusdem generis* in the case at bar, if the language employed in the concluding words is to have accorded to it its usual signification. But the very terms of the charter authorize the licensing of 'agents,' and the defendant's calling falls within the ordinary

meaning of that term, if, indeed, it may not properly be included in the term 'mercantile agents,' i. e., those engaged in the sale of commodities.''

In the case of St. Louis v. Weitzel, 130 Mo. 600, this court, adhering to the construction theretofore placed upon the fifth clause of section 26, article 3, of the charter of the city of St. Louis, says, l. c. 619:

''But it is said that, the evidence disclosing that a license tax has already been paid on the wagon, it 'cannot be taxed twice for the same purpose.' This is doubtless correct, but the city is not here attempting to impose a double tax for the same purpose. The occupations are entirely different, and the city, under paragraph 5, section 26, of its charter, has the power to 'license, tax, regulate or suppress all occupations, professions and trades not heretofore enumerated, of whatever name and character.' This would, of course, include the power to license—tax the 'business of hauling garbage.' ''

This provision of the charter of the city of St. Louis was again presented to this court in the case of Ex parte Smith, 231 Mo. 111, wherein the petitioner contended that the city of St. Louis had no authority to require a license of a plumber. The court says, l. c. 119:

''Under the charter provisions quoted in the statement, the city has large powers to license and regulate trades and avocations, but it is insisted by the petitioner that because plumbers are not specifically named, the city has no right to license and regulate their business, and he invokes the rule of *ejusdem generis,* which requires that 'where a particular class is spoken of, and general words follow, the class first mentioned is to be taken as the most comprehensive and the general words treated as referring to matters *ejusdem generis* with such class.' [Broom's Leg. Maxims (6 Ed.), p. 625.] While this maxim has often been applied by this court, it has been said that its purpose was to ascertain the real intention of the lawmaker and not a rule of abrogation. As was well

said by VALLIANT, J., in Bank v. Ripley, 161 Mo. 132: 'It is not a castiron rule, it does not override all other rules of construction, and it is never applied to defeat the real purpose of the statute, as that purpose may be gathered from the whole instrument.' Judge SHERWOOD, in State v. Schuchmann, 133 Mo. 120, applied the rule *ejusdem generis* and spoke of it as a 'good rule of construction,' but in St. Louis v. Weitzel, 130 Mo. l. c. 619, the same learned judge did not find that rule prevented his giving the words 'regulate or suppress all occupations, professions and trades not heretofore enumerated, of whatever name and character' (Par. 5, Sec. 26, Art. 3, Charter of St. Louis) their full effect so as to include the power to license the business of hauling garbage. . . . In our opinion, then, the city, under its charter, had the power to license and regulate the business of plumbing.''

Finally, in the case of St. Louis Gunning Co. v. St. Louis, 235 Mo. 99, this court says, l. c. 147:

''Returning to the charter provisions before mentioned it will be seen that the city is given the power to license, tax and regulate all businesses, trades, avocations or professions; and to license, tax, regulate or suppress all occupations, professions and trades, etc. It cannot be seriously contended that plaintiff is not engaged in some sort of business, trade or occupation; and if so, then clearly under the foregoing charter provisions that business was subject to be licensed and taxed, and to be regulated and even suppressed, if in character it was a nuisance *per se*.''

And, as was held in the Gunning case, it cannot be seriously contended that the appellant was not engaged in some kind of business, trade or occupation other than that of an ordinary merchant, and if so, then clearly under the foregoing charter provision that business was to be licensed, taxed and regulated, by ordinance of the city.

This insistence therefore of appellant is ruled against him.

II.   Counsel for appellant next insist that the ordinance under consideration "is unconstitutional and void, because it assesses an occupation tax which is not uniform upon the same class of subjects, and is, therefore, violative of Section 3, Article 10, of the Constitution of the State of Missouri," and cite in support thereof: Judson on Taxation, page 599, par. 459; State ex rel. v. Ashbrook, 154 Mo. 375, and Kansas City v. Grush, 151 Mo. 128.

**Equality of Taxation.**

The contention is that a junk dealer is a merchant, and because the ordinance in question imposes a tax upon merchants dealing in junk, which is not imposed upon those dealing in other kinds of merchandise, therefore, the tax is not uniform upon the same class of subjects within the meaning of the constitutional provision mentioned.

We are unable to see in what way the Grush case supports appellant's contention.   In that case the ordinance prohibited any person from carrying on the business of a "commission merchant and produce dealer," without first taking out a license, etc.   The question there was, could a person, by carrying on the business of the one and not that of the other, thereby render himself not liable for the tax.   The court held that under the ordinance the license tax could be · collected from either the commission merchant or the produce dealer, and that a person engaged in either capacity could not escape the tax because he was not engaged in both.   That ruling was based upon the fact that the court held that both a commission merchant and a produce dealer were embraced within the meaning of the charter merchants.   In discussing that question, GANTT, P. J., in speaking for the court, on page 133, said:

"After weighing the whole ordinance together we are of the opinion that the criminal court properly construed that the license, if constitutional, could be exacted of either commission merchants or produce dealers, and a person, firm or corporation following

273 Mo.—36

either vocation or occupation could not escape the tax because he or they did not engage in both. This we think is the ordinary meaning of the words in the connection in which they are found. There is no such general and prevailing custom of uniting produce dealers and commission merchants in one person, firm, or corporation as to lead us to the conclusion sought by defendant. The ordinance simply grouped the various persons who should pay the $50 license.''

Then proceeding to discuss the constitutionality of the ordinance, he further said:

''There is no specific authority conferred upon Kansas City to tax produce dealers *eo nomine,* but its power to do so is referable to subdivision 10, section 1, article 3, of the charter, which authorizes said city to license, tax and regulate ''merchants,'' and the general laws of the State forbid any municipality to impose a license tax on any business, avocation, or calling unless the same be specially named as taxable in its charter. [Sec. 1900, R. S. 1889.] That the license fee which the city seeks to compel defendant to pay is a tax does not admit of doubt. On its face it is perfectly apparent that the purpose of the ordinance is to raise revenue, and when this is the case it is a tax and must conform to the requirement of section 3, article 10 of our Constitution, which provides that taxes shall be uniform upon the same class of subjects within the territorial limits of the authority levying the tax. [St. Louis v. Spiegel, 75 Mo. 145; St. Louis v. Spiegel, 90 Mo. 587.] In these two cases it was held that section 3 of article 10 of the Constitution prevents discrimination between objects belonging to the same class of subjects within the territorial limits of the authority levying the tax, and accordingly an ordinance which required a license tax of $100 on meat shops in one part of the city and $25 in the rest of the city was void—likewise an ordinance requiring a license tax of all meat shops but providing that owners of shops in one portion of the city could sell both at their shops and on their wagons, while those in the old city limits could only sell at

their shops, was held to be unconstitutional. Keeping in view then that the city has no power to impose a license tax on any business not specifically named and that the right to tax defendant's business is solely because he is a merchant it follows that the people in the freeholders' charter have placed all merchants in one class for the purpose of an occupation tax, and it is essential that it be uniform and equal, but the common council, in this ordinance has clearly discriminated by taxing this merchant who deals in produce and exempting those who deal in dry goods or groceries alone.

"The inequality of the exaction arises as readily in this case by arbitrary classification as it did in the Spiegel case by levying different amounts on the same class.

"No power was conferred upon the city to re-classify merchants and tax one sub-class and exempt another.

"Nor is there any reason why a merchant who deals altogether in produce should be required to pay $50 for the privilege of carrying on his business in addition to his *ad valorem* tax, while his neighbor who deals in groceries, hardware or dry goods is wholly exempt from a license tax. Both are merchants, and neither is subject to more burdens than the other. No doubt exists as to the power of the Legislature or of a special charter to divide the various occupations into different classes, and that a tax upon all persons belonging to one class would not be obnoxious to the Constitution merely because another class was not taxed, but when as in this case the ordinance singles out a part of a legal class, to-wit, merchants, and imposes a burden upon it, and exempts all others of the same class, then those against whom this unjust discrimination is directed may justly complain of the violation of the constitutional guaranty of equality of taxation, and equal protection of the laws."

It should be observed that the ordinance in that case was held to be unconstitutional because "the charter placed all merchants in one class for the purpose of

taxation," and the ordinance subdivided that classification and imposed the tax upon one of the subdivisions and not upon the other, and thereby discriminated against the defendant, who dealt in produce, and exempted those who dealt in dry goods, groceries, etc. But in that same case this court was careful to state that "no doubt exists as to the power of the Legislature or of a special charter to divide the various occupations into different classes, and that a tax upon all persons belonging to the one class would not be obnoxious to the Constitution *merely because another class was not taxed.*"

The language just quoted fits the facts of this case like a glove fits the hand. By reading the charter provision under consideration, it will be seen that merchants and junk merchants or junk dealers are not placed in the same class, as was the fact in the Kansas City Charter, but upon the contrary, the charter never placed the second-hand or junk dealers in the same class with the ordinary merchant, but in general terms empowered the city by ordinance to license and tax them as shown by Paragraph 1 of this opinion; not only that, but counsel for appellant, as previously shown, contended that the city was wholly without power to license and tax junk dealers, that such power had not been delegated to the city along with the specifically enumerated grants mentioned in the charter, or by the general power conferred thereby. So if we should take appellant's own view of this charter provision, it could not be logically contended that the ordinary merchant and the junk dealer are included in the same class of persons for the purpose of taxation. Each is clearly placed in a different class; the former by the express terms of the charter, and the latter by the ordinance under consideration.

If I correctly understand the Grush case, it is an authority against appellant's contention, instead of being one supporting it.

I tried the Ashbrook case, supra, while on the Circuit Bench, and I am unable to see in what manner it

bears upon the question now under consideration. This question is decided against appellant.

III. There is another equally good reason why the ordinance under consideration should be upheld, and that is section 26 of article 3 of the charter of the city of St. Louis provides that:

*Police Regulation.*

"The Mayor and Assembly shall have power within the city, by ordinance not inconsistent with the Constitution or any law of this State, or of this charter: . .

Sixth. To establish and enforce quarantine laws and regulations; to prevent the introduction and spread of contagious diseases; to establish and regulate hospitals, and to secure the general health of the inhabitants by any measure necessary. . . .

"Twelfth. . . . direct the safe deposit of ashes, or other dangerous rubbish or material. . . .

"Fourteenth. Finally, to pass all such ordinances, not inconsistent with the provisions of this charter, or the laws of the State, as may be expedient, in maintaining the peace, good government, health and welfare of the city, its trade, commerce and manufactures, and to enforce the same by fines or penalties, not exceeding five hundred dollars, and by forfeitures not exceeding one thousand dollars."

Under these provisions of the charter the city was empowered to enact such police regulations as would insure the safety, health, comfort and welfare of its citizens, and the protection of their persons and property; and it might be said, that the city, independent of those charter provisions, has the inherent authority to enact such police regulations as may be necessary for the good government thereof and for the protection of its inhabitants. The authorities so holding are numerous. It has ever been held that the business of junk and second-hand dealers, as well as that of pawnbrokers, is of such character as to warrant police regulation. The reason for this is much stronger than it is for the regu-

lation of ordinary merchants, brokers and commission
men. Regarding the latter: their goods, merchandise
and securities are new and generally securely stored in
some sanitary building or warehouse which largely
keeps or protects them from disease germs and reduces
the opportunities for theft to a minimum; whereas the
junk or second-hand dealer purchases goods and per-
sonal property which is distributed among individuals
throughout the inhabited world, and used for all pur-
poses in the various avocations or walks of life, whether
sanitary or not. This wide distribution and universal
use of such property, in the very nature of things, makes
it an easy object to theft, and readily contaminated
with the deadly germs of contagious and infectious
diseases. I can conceive of nothing which would be more
detrimental to the public health and good morals, or
render property more insecure than the unregulated
purchase, barter and sale of such property.

The foregoing observations somewhat differentiate
the character of the two businesses or occupations, and
clearly show why the junk or second-hand dealer should
be subjected to police regulations, and why such regu-
lations are encouraged by the law, and upheld by the
courts.

In the case of St. Joseph v. Levin, 128 Mo. 588,
an ordinance of that city requiring a pawnbroker to keep
a book for the registration and description of personal
property received in pawn, or purchased by him, was
challenged upon constitutional grounds. On page 593
this court in discussing that question said:

"The ordinance is a mere police regulation which
the city, by virtue of its charter powers, had the right
to pass, to aid in the prevention and detection of larce-
nies of personal property which is frequently sold or
pledged to pawnbrokers by thieves, and not for the pur-
pose of preserving evidence to be used against any
other person. The defendant was not charged with any
crime, nor was there any pretense that he was guilty
of crime, and because of the fact that the book might

tend to show that he was in the possession of property which had been stolen; that he might possibly be prosecuted at some future time for receiving it, knowing that it had been stolen, and the information acquired by the police officer from an inspection thereof used against him, was no reason why he should not have complied with the ordinance, and submitted the book to the inspection of the police officer.''

And on page 594 the court further said:

''No person has the right to follow such occupation within the limits of said city without first obtaining a license from its authorities for that purpose, which may be granted or withheld at pleasure. The business is a privilege, not a right, and he who avails himself of it and derives its benefits must bear its burdens, and conform to the laws in force regulating the occupation, if not illegal.''

In the case of State v. Baskowitz, 250 Mo. 82, l. c. 101, this court in holding the State had the right to regulate dealers in second-hand bottles under the police power, said:

''We are convinced that the result sought to be attained by these statutes is meritorious; that a constitutional enactment regulating the subject-matter would minimize theft and the receiving of stolen property, and make for morality; that viewed in the concrete case defendant's condition and attitude excite no emotion, except condemnation, but we are constrained to line these statutes by the Constitution, disregarding our conception as to the moral phase and the eternal fitness of things.''

The laws of other states and city ordinances regulating the business of junk and second-hand dealers have been the subjects of numerous decisions of the courts thereof.

In the case of Grand Rapids v. Braudy, 105 Mich. 670, the validity of an ordinance regulating pawnbrokers, junk dealers and dealers in second-hand goods, was held in judgment. The ordinance required that such

dealers should take out a license and pay the fee of twenty-five dollars therefor, present an application signed by twelve freeholders, citizens of good reputation, who would vouch for the good character of the applicant; required such dealers to give bond to the city in the sum of two thousand dollars to conduct their business honorably, to put a sign over their door having the words "Licensed Junk Dealer" thereon, to keep a register of all goods bought and sold in a very particular manner, to present to the chief of police of the city a copy of said register daily, and other stringent requirements. In sustaining the validity of the ordinance, the court says, l. c. 675:

"It is next insisted that the ordinance is so unreasonable that it should be declared void. The charter expressly confers upon the Common Council the power to license and regulate pownbrokers, junk dealers and dealers in second-hand goods. Courts cannot interfere with legislative discretion and are slow to declare ordinances invalid because unreasonable when the power to legislate upon the subject has been conferred upon the Common Council. The Council's discretion, and not the court's, must control. In such matters, the city authorities are usually better judges than the courts. . . It is common knowledge that thieves resort to these places to dispose of their stolen goods and that unscrupulous, and oftentimes criminal, persons are engaged in the business. The business, therefore, comes expressly within the control of the police power of the State and is properly subject to reasonable rules and regulations. A very clear abuse of this power must be shown in order to justify the court in declaring the regulations to be unreasonable and void. While this business is legitimate in the absence of any statute law controlling it, no inalienable right exists to carry it on without complying with those provisions and restrictions which the legislative power of the State has seen fit to require."

And on page 677, the court said:

"We cannot hold unreasonable that provision pro-
hibiting the licensee from purchasing from boys, intoxi-
cated persons, or habitual drunkards. The reason for
this provision is apparent, for it is well known that there
are many young thieves in the large cities who steal
property and resort to these places, ready to sell it for
a mere nominal sum. It is also well known that habitual
drunkards will use the same means to obtain money to
satisfy their appetites for intoxicating liquors."

In the case of Grossman v. Indianapolis, 173 Ind.
157, the court, in upholding the validity of an ordinance
of the city of Indianapolis containing all of the provi-
sions of the ordinance here in question and many more
drastic regulations, says, l. c. 163:

"Complaint is made of section five of the ordi-
nance, which requires the dealer to make and keep an
accurate description of the goods, articles and things
purchased, together with the name, age, residence, color,
weight, height, complexion, style of beard and dress of
the seller.

"The right to pursue the business of a junk dealer
is not inalienable, but by the State may be restricted to
any extent deemed proper or wholly denied. In the
absence of prohibitory legislation, it is legitimate, and,
in seeking to prevent waste and conserving old and
wornout materials, is beneficial, but it is not absolutely
essential to the welfare of society. In the case last cited,
in speaking of junk dealers and their places of business,
the court said: 'It is common knowledge that thieves
resort to these places to dispose of their stolen goods and
that unscrupulous, and oftentimes criminal, persons are
engaged in the business.'

"The business comes clearly within the scope of
the police power of the State, and those engaged in it
must know that in pursuing such calling they are ex-
ercising a personal privilege, rather than an absolute
right without any guaranty or contract, expressed or im-
plied, for a definite continuance. The purposes actuating
the enactment of provisions regulating such business

are the highest that can concern organized society. The objects, among others, are to prevent both old and young from entering upon a tempting species of petty thievery, to expose dishonest and criminal practices in receiving and concealing stolen property, to assist in reclaiming and restoring such property to the rightful owner and to facilitate the detection and punishment of thieves. The State has placed dealers under the ban of a license and has authorized cities still further to tax, license and regulate their business. The courts are slow to declare any police ordinance invalid on the ground that it is unreasonable when the power to legislate upon the subject has been expressly conferred upon the Common Council, and certainly a very clear abuse of power must be shown to justify a court in declaring void provisions so vital to the good of society as those here involved·''

In the case of State v. Cohen, 73 N. H. 543, the court, upholding a law authorizing the mayor and aldermen of a city to license persons deemed suitable to be dealers in and keepers of shops for the purchase and sale of old junk, second-hand bottles, etc., says, l. c. 545:

''The defendant takes the further position that the statute is void because its provisions conflict with those of the State and United States Constitutions. It is a matter of common knowledge that the business of dealing in old junk, second-hand articles, etc., furnishes peculiar facilities for the disposition and loss of identity of stolen goods and articles infected with contagious diseases. The business is quite liable to become a 'fence' for the protection of offenders from discovery and punishment, and so to promote thieving and its evil consequences. It also brings together a mass of wornout and discarded materials of a highly combustible nature. The business endangers the public morals, safety, and welfare, and consequently is subject to regulation by an exercise of the police power of the State.''

In the case of Phillips v. State, 77 Ohio St. 214, the court says, l. c. 216:

"It is almost an axiom that anything which is reasonable and necessary to secure the peace, safety, morals and best interests of the commonwealth may be done under the police power, and this implies that private rights exist subject to the public welfare."

In the same case the court says, l. c 217:

"The business of dealing in second-hand articles and junk is one which is peculiarly liable to abuse; and, whether honestly conducted or not, experience has shown that stolen or lost property frequently finds its way to the junk dealer, through the agency of the persons who have unlawfully appropriated it. In view of the fact that it frequently happens that individuals seeking to reclaim their property are suddenly stopped and forever baffled at the door of the junk dealer's shop, the requirements complained of here seem to us to be very fair and moderate."

While it is true the authorities considered do not brand the business of a junk or second-hand dealer as being *malum in se,* they do clearly hold that, because it borders so closely upon that line, if not regulated, it would so greatly jeopardize the public safety, health and morals, by subjecting most second-hand property to theft, and the people of the country to all manner of contagious and infectious diseases, that it cannot successfully be contended that an inalienable right exists within the meaning of the Constitution to conduct the latter business any more than it does to carry on the former; both, therefore, clearly fall within the police power of the State, and it may, in its sound discretion regulate either one or both of them.

We are, therefore, of the opinion that the ordinance in question is not obnoxious to the constitutional provisions mentioned.

IV. It is also insisted by counsel for appellant that "one dealing exclusively in old bottles cannot be

regarded as a junk dealer, and hence subject to an ordinance requiring a license of junk dealers; *a fortiori,* one dealing exclusively in large quantities of new and old bottles, the largest percentage thereof being in new bottles, cannot be regarded as a dealer in junk.'' In support of this insistence we are cited to the following cases: Carberry v. United States, 116 Fed. 773; City of Chicago v. Reinschreiber, 121 Ill. App. 114; City of Chicago v. Lowenthal, 242 Ill. 404; City of Chicago v. Lowenthal, 146 Ill. App. 570; Metal Refining Co. v. Chicago, 140 Ill. App. 599; Lines v. Mayor of Savannah, 61 S. E. (Ga.) 598.

<div style="margin-left:2em">Old Bottles.</div>

The Carberry case, the first cited, in our opinion is not in point. There the plaintiff imported old bottles, and sought to have them classed as junk, the tariff on which was much less than on bottles. In deciding that case, the court said: ''We hold that old bottles capable of being used as bottles are not junk.'' In our opinion that holding, within the meaning of the tariff schedules was correct, for the reason that Congress used the word. ''junk'' in the sense of its ordinary acceptation, which, according to Mr. Webster, means: ''1. Pieces of old cable or old cordage. 2. Old iron or other metal, glass, paper, etc.'' Bottles neither new nor old are mentioned, and of course, when Congress used the word ''junk'' as before defined, it included neither old nor new bottles.

Moreover, Congress had only one object in view and that was to raise revenue, while the primary object of the city council was to protect the public health, morals and safety of the people of the city, and incidentally, to raise revenue; naturally, therefore, the city council used the words ''junk dealers'' in a very different sense. from that in which Congress used the word ''junk.'' And in order that there might be no misunderstanding as to the meaning of the ordinance, the city council, in the same ordinance defined ''junk merchants'' to be: ''Any person or persons engaging in the business of buying, selling or dealing in old junk, metals, bottles, syphons, books or other articles usually found in junk

shops, and having a store, stand, or place of business, are hereby declared to be 'junk merchants.' '' Clearly this is not the sense in which Congress used the word ''junk,'' and it is equally clear that if the city council had simply used the word ''junk'' as Congress did without defining its meaning, then neither new nor old bottles would have been taxable under the ordinance. But in this connection it should also be borne in mind that the city council was in no sense trying to define the word ''junk,'' but did define the words ''junk merchants,'' and from that definition we see that the ''junk merchant'' not only deals in ''junk'' as defined by Mr. Webster, but also in old bottles, syphons, books or other articles usually found in ''junk shops.'' None of these articles could have been imported into this country, under the act of Congress as junk, yet that does not signify that the city council by ordinance could not tax any person dealing *in any one* or *all of those things* as ''junk merchant.'' [Kansas City v. Grush, 151 Mo. 128.]

The other authorities cited by counsel for appellant seem, from the face of the briefs on file, to be in point, and sustain their position; but as neither the statutes, nor the ordinances upon which they are bottomed are before us, we are unable to say positively that they are in point. But be that as it may, in view of the authorities hereinbefore considered, we are not satisfied with the reasoning of the learned courts which decided those cases.

The able opinion of the Supreme Court of New Hampshire in the case of State v. Cohen, 73 N. H. 543, is more in keeping with sound reason, and the wisdom underlying the regulations prescribed in ordinances of this character, than are those of the courts just mentioned. In this Cohen case the court on page 545 said:

''If the statute was intended principally to protect the public against the evils resulting from the crime of larceny, by providing facilities for tracing the stolen property and restoring it to its owner, and for the detection and punishment of the thief (Commonwealth v.

Hood, 183 Mass. 196), it would not follow, as the defendant argues, that it would naturally be limited in its application to shopkeepers or petty dealers. Thieves sometimes steal on a large scale and need facilities for 'wholesale dealing' to dispose of their plunder. They need a 'fence' between themselves and the officers of the law, quite as much as petty thieves do. Furthermore, there is nothing inherent in the nature of a shop which renders it more liable than a store or other building, or an open lot, to be resorted to by thieves for the disposition of their plunder, or more or less useful in tracing stolen property, and those who steal it. But the statute evidently was designed also to protect the public against the spread of contagious diseases and the starting and spread of fires—evils which the traffic in old junk, second-hand articles, etc., is specially liable to produce. The larger the accumulation of the articles, the greater are those dangers.''

This insistence of appellant is, therefore, ruled against him.

V. Counsel for appellant contend that since he had paid a merchant's tax, both state and city, the exaction of this junk merchant's tax also is an attempt of double taxation.

**Double Taxation.**

In support of this contention we are cited to the following cases: Etterman v. Shelton, 104 Tenn. l. c. 70; City of Newport v. Fitzer, 115 S. W. (Ky.) 742; Kansas City v. Grush, supra.

This last case, as heretofore shown, has no application to the facts of the case at bar. There the validity of the ordinance was assailed because of its lack of uniformity, that is, it imposed an occupation tax upon certain merchants, and failed to impose the same tax upon others engaged in the same general class of business. That was in no sense of the term double taxation; and whatever may be the rule upon this question in Tennessee and Kentucky, is immaterial in this State, because this court has repeatedly held that an *ad valorem*

tax on property used in a business, and an occupation tax imposed upon the person conducting that business, are not double taxation.

In the case of St. Louis v. Weitzel, 130 Mo. 600, the court says, l. c. 619:

"Under its charter powers the city may levy these taxes: First: A tax on property; second: A vehicle tax for use of streets; third: A tax on the business or occupation. [St. Louis v. Green, 7 Mo. App. 470; St. Louis v. Sternberg, 69 Mo. l. c. 302.]

"And, if different occupations are pursued, it is competent to impose a license tax on each occupation. Of this there can certainly be no dispute, and the contention cannot therefore prevail that a license tax paid on a wagon for the general use of the streets can be converted at the will of the licensee to pursue with that wagon any other occupation or trade, etc. As well might a merchant licensed under the provisions of Section 6919, Revised Statutes 1889, assume the role of an auctioneer, Section 678, Revised Statutes 1889, and (apart from the privilege conferred by Section 693) claim, because he had taken out a license on the stock of goods in his store as a merchant, that, therefore, the State had no further concern in the matter, and he might choose the manner in which he might sell his goods over the counter, whether by public or private vendue, and then, if the State interfered with his operations as auctioneer, vociferously assert that the law was arbitrary, unjust, oppressive and unconstitutional."

The same rule is announced in the case of American Manufacturing Company v. City of St. Louis, 270 Mo. 40; also in City of St. Louis v. United Railways Company, 263 Mo. 387. The latter case was taken to the Supreme Court of the United States, and was there affirmed (241 U. S. 647). [See also St. Louis v. Green, 70 Mo. 562; St. Louis v. Weitzel, 130 Mo. 600; Aurora v. McGannon, 138 Mo. 38; Monett v. Hall, 128 Mo. App. 91.]

This contention is ruled against appellant.

VI. It is further insisted that appellant's motion to quash should have been sustained and the appellant discharged, because section 1605 of Ordinance 24751 of the city of St. Louis, is unconstitutional and void, because it deprives the appellant of his property without due process of law, and is, therefore, in violation of Section 30, Article 2, of the Constitution of the State of Missouri; further, because it authorizes unreasonable searches and seizures for private purposes, and is, therefore, in violation of Section 11, Article 2, of the Constitution of the State of Missouri. The following cases are cited in support thereof: Lowry v. Rainwater, 70 Mo. 152; City of St. Joseph v. Levin, 128 Mo. 588; 1 Bishop on Criminal Procedure (4 Ed.), sec. 240; Robinson v. Richardson, 13 Gray, 454.

This insistence is untenable. This identical question was presented to this court in the case of the City of St. Joseph v. Levin, 128 Mo. 588, and it was there held that an ordinance requiring a pawnbroker to keep a book of registry of all goods, merchandise, etc., pawned or purchased by him, etc., and providing that it should be opened to the mayor and any policeman for inspection, was unreasonable and void.

While it is true as contended for by counsel for appellant that the book of register in the Levin case was only liable to inspection by the mayor and police officers, while the one required to be kept by this ordinance must "be kept open for the inspection and examination of the police or any citizen."

When we consider the purpose for which this portion of the ordinance was enacted, we are of the opinion that it does no violence to the search-and-seizure clause of the Constitution. While the ordinance requires the junk dealer to keep the book open for the inspection of the police or *any citizen,* yet the citizen there mentioned clearly refers to any one whose property has been stolen, and who demands an inspection of the book of registry for the purpose of assisting him in the discovery of the property, and the apprehension of the thief. That is the ground upon which this court, and those of other

states have held, that such an ordinance is valid; and for as strong, if not for stronger reasons, such an ordinance requiring the junk dealer to submit the book to the inspection of the person whose property has been stolen, should be held to be reasonable and valid.

If the ordinance referred to had authorized any disinterested idle person to inspect the book at pleasure, then there would be much force and justice in appellant's insistence; but there is nothing contained in this ordinance, nor in the history of this class of legislation which tends to show that it was the intention of the legislative body to confer that right upon any disinterested person.

This insistence is also ruled against the appellant.

VII. Counsel for appellant make the further point that the ordinance in question is void because it is unreasonable and oppressive, in that it requires him to keep a registry, etc., of all old bottles purchased, which it is contended would be practically impossible of a business of the proportions as that shown by the evidence in this case.

This contention is not sound for the reason heretofore stated, namely: That appellant has no inalienable right to conduct a junk shop within the meaning of the Constitution, but only has a privilege to so do, which may be regulated or absolutely denied under the police power of the State exercised for the preservation of the lives and property of the people of the city, and for the protection of the public health, safety and morals thereof. Clearly the proportions of the business can in no manner increase or diminish the authority of the State to regulate the same; but if a reason for such a distinction should exist, it would be stronger in favor of regulating a large business than it would be for the regulation of a small business; the larger the business necessarily the larger are the incidental dangers arising therefrom. These views are fully supported by the authorities heretofore considered.

273 Mo.—37

We are, therefore of the opinion that the trial court did not err in sustaining the objection to the evidence offered for the purpose of showing the great difficulty which would be encountered in keeping such a registry; if greater than appellant is willing to assume then he may gracefully retire from the business or so reduce the same to such a point as to escape that difficulty.

VIII. There are one or two other minor points presented and discussed in briefs, but under the views we have taken of the case they have fallen by the wayside, and are no longer worthy of consideration.

For the reason stated, the judgment of the St. Louis Court of Criminal Correction is affirmed. All concur except *Bond, P. J.,* absent.