(PRIZE.)

## The St. Joze Indiano.—LIZAUR, Claimant.

loods were shipped by D. B. & Co. of Liverpool, on board a neutral ship bound to Rio de Janeiro, which was captured and brought into the United States for adjudication. The invoice was headed, " consigned to Messrs. D. B. & F., by order and for account of J. L." In a letter accompanying the invoice from the shippers to the consignees, they say, " For Mr. J. L. we open an account in our books here, and debit him, &c. We cannot yet ascertain the proceeds of his hides, &c., but find his order for goods will far exceed the amount of these shipments ; therefore we consign the whole to you, that you may come to a proper understanding with him." It was held that the goods were, during their transit, the property, and at the risk of the enemy shippers, and, therefore, subject to condemnation.

APPEAL from the circuit court for the district of Massachusetts. The ship St. Joze Indiano, bound from Liverpool to Rio de Janeiro, was captured and sent into the United States, as prize of war, in the summer of 1814. The ship and most of the cargo were condemned as British property in the circuit court, and there was no appeal by any of the claimants except in behalf of Mr. J. Lizaur, of Rio de Janeiro. The right of Mr. J. Lizaur, to have restitution of property belonging to him, at the time of capture, was not contested by the captors ; but it was contended, that the property in question, when captured, was at the risk of the shippers, Messrs. Dyson, Brothers & Co. of Liverpool. The bill of

lading did not specify any order, or account and risk. The invoice was headed, " consigned to Messrs. Dyson, Brothers & Finnie, by order, and for account of J. Lizaur." In a letter accompanying the bill of lading and invoice, of the 4th of May, 1814, from Dyson, Brothers & Co. to Dyson, Brothers & Finnie, they say, " For Mr. Lizaur, we open an account in our books here, and debit him, &c. We cannot yet ascertain the proceeds of his hides, &c., but find his order for goods will *far exceed the amount of these shipments, therefore we consign the whole to you, that you may come to a proper understanding with him.*" The house of Dyson, Brothers & Co., of Liverpool, and of Dyson, Brothers & Finnie, of Rio, consist of the same persons; goods claimed in behalf of the latter house were condemned on the ground that both firms represented the same parties in interest, and from this decision there was no appeal.

*Harper*, for the appellant and claimant. This case may be contrasted with those said to be similar. In the case of Kimmel and Alvers,[a] on the authority of which this portion of the cargo was condemned in the court below, the claimants had ordered the goods shipped, but there was no evidence that they had paid for any part of the goods, or that they were charged to them by the shippers. In that case the breaking out of the war produced a change in the destination of the goods, and a complete control over them was retained by the vendor, which con-

a The Merrimack. February term, 1814.

trol was exercised by his directing his agent not to deliver them without payment in cash, in case war should have been declared before their arrival. The doctrine in the case of the Messrs. Wilkins,[b] fully bears out the present claim. In that case, the mere right of stoppage *in transitu*, was held to be vested by the shipper in his agent, to be exercised only in the event of insolvency. But in the case now before the court, the power of Dyson & Co. was limited to an arrangement for the payment of a certain part of the price only which remained unpaid. In the case of the Messrs. Wilkins no part was paid in advance, and the goods were not charged to the claimants, another circumstance which distinguishes it from the present. The case of Magee and Jones,[c] and that of Dunham and Randolph,[d] was a mere offer to sell, not a sale agreed to by the vendee, like that in the present case.

*Dexter*, for the respondents and captors. The case is clearly within the principles adjudged. Thus, it has been determined, incidentally, at the present term, in the case of Van Wagenan,[e] that property is not immediately vested in the correspondent by a purchase by his agent, by order, whether it be with the money of the former or latter. The case of Messrs. Wilkins was not a unanimous decision of the court, but is clearly distinguishable from the pre-

b  The Merrimack.  February term, 1814.
c  The Venus.  February term, 1814.
d  The Frances.  February term, 1815.
e  The Mary and Susan.  Vide supra, p. 46.

sent.   Here there was no change of possession from
the shippers: the goods were in their possession
during the voyage, by their agent, the master; had
the goods arrived, they would still have been in
their possession, by their agents, the consignees.   If
the goods remained the property of the shippers at
the time of shipment, and during the voyage, then
they became the property of the captors, *jure belli.*
They remained the property of the shippers, be-
cause they were consigned to their agents, to be de-
livered, *contingently,* to the claimant.   Therefore the
goods are confiscable as prize of war.   The cases of
Magee and Jones, and of Dunham and Randolph, are
in point.

1816.

The
St. Joze In-
diano.

STORY, J., delivered the opinion of the court, and,
after stating the facts, proceeded as follows:

March 9th.

The single question presented on these facts is,
in whom the property was vested at the time of its
transit; if in Mr. Lizaur, then it is to be restored;
if in the shippers, then it is to be condemned.   It is
contended, in behalf of the claimant, that the goods
having been purchased by the order, and partly
with the funds, of Mr. Lizaur, the property vested in
him immediately by the purchase, and the contract
being executed by the sale, no delivery was necessary
to perfect the legal title: that nothing was reserved to
the shippers but a mere right of stoppage *in transitu,*
and that if they had been burnt before the shipment,
or lost during the voyage, the loss must have fallen
on Mr. Lizaur.

.1816.

The
St. Joze In-
diano.

The doctrine as to the right of stoppage *in transi-tu*, cannot apply to this case. That right exists in the single case of insolvency, and presupposes, not only that the property has passed to the consignee, but that the possession is in a third person in the transit to the consignee. It cannot, therefore, touch a case where the actual or constructive possession still remains in the shipper or his exclusive agents. In general, the rules of the prize court, as to the vesting of property, are the same with those of the common law, by which the thing sold, after the completion of the contract, is properly at the risk of the purchaser.*f* But the question still recurs, when is the contract executed? It is certainly competent for an agent abroad, who purchases in pursuance of orders, to vest the property in his principal immediately on the purchase. This is the case when he purchases exclusively on the credit of his principal, or makes an absolute appropriation and

*f* By the common law, the right of property in the thing sold is completely vested in the purchaser by the execution of the contract, subject to the equitable right of stoppage *in transitu* in case of insolvency, and where the bill of lading has not been, in the mean time, endorsed to a third person. But by the civil law, the right of property was not vested in the purchaser, unless the goods were paid for, or sold on a credit. *Just.* 1. 2. tit. 1. s. 41. *Pothier Traité de Vente*, No. 322. But this rule is not copied by the Napoleon Code, which, on the contrary, adopts a principle similar to that of the common law. *Elle* (*la vente*) *est parfaite entre les parties, et la propriété est acquise de droit a l'egard du vendeur, des qu'on est convenu de la chose et du prix, quoique la chose n'ait pas encore été livrée ni le prix payé.* Code Napoleon, l. 3. tit. 6. c. 1. No. 1583. The French Commercial Code also subjects the goods sold to the right of stoppage *in transitu*, by the vendor, upon the same conditions with our own law. *Code de Commerce*, l. 3. tit. 3. *De la Revendication.*

designation of the property for his principal. But where a merchant abroad, in pursuance of orders, either sells his own goods, or purchases goods on his own credit, (and thereby, in reality, becomes the owner,) no property in the goods vests in his correspondent until he has done some notorious act to devest himself of his title, or has parted with the possession by an actual and unconditional delivery for the use of such correspondent. Until that time he has in legal contemplation the exclusive property, as well as possession; and it is not a wrongful act in him to convert them to any use which he pleases. He is at liberty to contract upon any new engagements, or substitute any new conditions in relation to the shipment. These principles have been frequently recognised in prize causes heretofore decided in this court.[g] In the present case, the delivery to the master was not for the use of Mr. Lizaur, but for the consignees, a house composed of the same per-

1816.

The St. Joze Indiano.

g In the Venus, at February term, 1814, on the claim of Messrs. Magee & Jones, Mr. Justice WASHINGTON, in delivering the opinion of the court, observed: "To effect a change of property, as between seller and buyer, it is essential that there should be a contract of sale agreed to by both parties, and if the thing agreed to be purchased is to be sent by the vendor to the vendee, it is necessary to the perfection of the contract that it should be delivered to the purchaser, or to his agent, which the master of a ship to many purposes is considered to be." And adverting to the facts of that claim, he further says: "The delivery of the goods to the master of the vessel was not for the use of Magee & Jones, any more than it was for the shipper solely, and consequently it amounted to nothing so as to devest the property out of the shipper until Magee should elect to take them on joint account, or to act as the agent of Jones."

sons as the shippers, and acting as their agents. They, therefore, retained the constructive possession, as well as right of property, in the shippers; and it is apparent from the letter, that the shippers meant to reserve to themselves and to their agents, in relation to the shipment, all those powers which ownership gives over property. It is material, also, in this view, that all the papers, respecting the shipment, were addressed to their own house, or to a house acting as their agents, and the claimants could have no knowledge or control of the shipment, unless by the con ent of the consignees, under future arrangements to be dictated by them. In this view this case cannot be distinguished from that of Messrs. Kimmell and Alvers; and it steers wide of the distinction upon which Messrs. Wilkins' claim was sustained.[h] The authorities also cited at the argument by the captors are exceedingly strong to the same effect. The Aurora[i] approaches very near to the present case. There the shipment, by the express agreement of the parties, was, in reality, going for the use, and by the order, of the purchaser, but consigned to other persons, who were to deliver them if they were satisfied for the payment. And Sir William Scott there quotes a case as having been lately decided, where goods sent by a merchant in Holland, to A., a person in America, by order, and for account, of B., with directions not to deliver them unless satisfaction should be given for the payment, were condemned as the property of the Dutch shippers.

h The Merrimack. February Term, 1814.
i 4 Rob. 218.

On the whole, the court are unanimously of opinion, that the goods included in this shipment were, during their transit, the property, and at the risk of the shippers, and, therefore, subject to condemnation. The claim of Mr. Lizaur must, therefore, be rejected.

Sentence affirmed with costs.